BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
Chief, National Security Division
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
   1500/1100 United States Courthouse
   312 North Spring Street
   Los Angeles, California 90012
   Telephone: (213) 894-3667/0762
   Facsimile: (213) 894-0141
   E-mail:    Ian.Yanniello@usdoj.gov
              Haoxiaohan.Cai@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 24-236-SPG(A)-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDIGN DEFENDANT SALVADOR PLASENCIA; EXHIBITS 1-5 |
| v. | |
| SALVADOR PLASENCIA, aka "Dr. P," | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorneys Haoxiaohan Cai and Ian V. Yanniello, hereby files its Sentencing Position Regarding Defendant Salvador Plasencia.

//

//

This position is based upon the attached memorandum of points and authorities, the exhibits attached hereto, including Ex. 1, excerpts of text messages between defendant and co-conspirator Mark Chavez, Ex. 2, excerpts of text messages between defendant and co-conspirator Kenneth Iwamasa, Ex. 3, handwritten notes provided by defendant in response to a subpoena, Ex. 4, a medical invoice provided by defendant in response to a subpoena, Ex. 5, an invoice to defendant from DV Medical, the files and records in this case, and such further evidence and argument as the Court may permit. Concurrent with this filing, the government is seeking sealing treatment of Exhibits 3 and 4.

Dated: November 19, 2025               Respectfully submitted,

                                       BILAL A. ESSAYLI
                                       First Assistant United States
                                       Attorney

                                       IAN V. YANNIELLO
                                       Assistant United States Attorney
                                       Chief, National Security Division


                                             /s/
                                       IAN V. YANNIELLO
                                       HAOXIAOHAN CAI
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Patients and the public trust doctors.  Doctors are charged with keeping us safe, and we rely on them --- especially in dark times when patients need help and hope the most.  Patients' trust in doctors is for good reason; the Hypocritic oath commands physicians to do no harm, to act for the benefit of the sick, and to place their patients' well-being above their own interests. This case is about defendant Salvador Plasencia ("defendant") repeatedly violating that oath and putting a patient in harm's way to enrich himself.

On September 30, 2023, defendant learned that Matthew Perry was seeking ketamine and was willing to pay top dollar to obtain it. Rather than do what was best for Mr. Perry --- someone who had struggled with addiction for most of his life --- defendant sought to exploit Perry's medical vulnerability for profit.  Indeed, the day defendant met Perry he made his profit motive known, telling a co-conspirator: "I wonder how much this moron will pay" and "let's find out."

Over the next few weeks, defendant sold vial after vial of ketamine to Mr. Perry, knowing that Perry's personal assistant was administering the ketamine without proper oversight or medical training.  Even after defendant saw Mr. Perry suffer an adverse reaction to a ketamine shot, he still offered to sell Perry more. While the ketamine that killed Mr. Perry on October 28 was not provided by defendant, defendant's egregious breaches of trust and abandonment of his oath to "do no harm" undoubtedly contributed to the harm that Mr. Perry suffered.

3

For the reasons set forth below, the government submits that a sentence of 36 months' imprisonment is necessary, just, and appropriate to adequate to account for defendant's crimes and satisfy the sentencing goals of 18 U.S.C. § 3553(a).

## II. DEFENDANT'S PLEA AGREEMENT AND RELEVANT FACTUAL BACKGROUND

### A. The Plea Agreement

Pursuant to a plea agreement, defendant pled guilty to four counts of distribution of ketamine on July 23, 2025. (See Dkts. 76 [Plea Agreement]; 78 [Minutes of Change of Plea].) In addition to the four counts of conviction, defendant stipulated in his plea agreement that pursuant to U.S.S.G. §§ 1B1.2(a) and (c), defendant also committed the more serious offense of Altering and Falsifying Records Related to a Federal Investigation, in violation of 18 U.S.C. § 1519. (See Dkts. 76 at ¶¶ 14-15; PSR ¶¶ 43-44, 58-64.)

### B. Defendant Repeatedly Sold Ketamine to Mr. Perry and Co-Conspirator Iwamasa

At all relevant times, defendant was a medical doctor who knew the risks associated with ketamine, including sedation, dissociation, psychiatric events, abuse and misuse by patients, among others. (PSR ¶¶ 17-18.) Defendant also knew, as reflected in his treatment notes for Perry, that patients "should be monitored by [a] physician when undergoing [ketamine] treatment as a safety measure." (PSR ¶ 18.)

On September 30, 2023, defendant was introduced to Matthew Perry by one of defendant's own patients who stated that Perry was a "high profile person" who was seeking ketamine and was willing to pay "cash and lots of thousands" for ketamine treatment. (PSR ¶ 19.) Motivated by the promise of a payday, defendant quickly contacted co-conspirator Chavez --- a doctor with access to ketamine --- to

procure ketamine to sell to Mr. Perry.  (PSR ¶ 18; see Ex. 1 at 2-3.) After defendant and Chavez agreed to meet to exchange the ketamine for payment, defendant stated, "I wonder how much this moron will pay."  (Ex. 1 at 4-5.)  In response to Chavez stating, "I wonder," defendant replied: "Let's find out."  (Ex. 1 at 5.)

Defendant then traveled to Costa Mesa where Chavez sold defendant four vials of liquid ketamine, ketamine lozenges that had been prescribed to a patient whom defendant did not know,[1] as well as gloves and syringes.  After obtaining the ketamine, defendant traveled to Mr. Perry's residence, in the Central District of California, where he injected ketamine into Perry and left additional ketamine with Kenneth Iwamasa, Perry's personal assistant. Iwamasa paid defendant approximately $4,500. After defendant met with Mr. Perry on September 30, he sent a text to Chavez claiming the meeting "was like a bad movie."  (Ex. 1 at 10.)

Despite defendant's words, defendant continued to obtain ketamine from Chavez to sell to Mr. Perry and co-conspirator Iwamasa. (PSR ¶¶ 21-28).  Over the course of the following weeks, defendant repeatedly traveled to Mr. Perry's residence and transferred ketamine to co-conspirator Iwamasa in exchange for payment, including on October 2 (sold vials of liquid ketamine and ketamine lozenges, see PSR ¶ 23), October 4 (sold vials of liquid ketamine and ketamine lozenges, see PSR ¶ 24), October 6 (sold vials of liquid ketamine, see PSR ¶ 25), October 8 (sold vials of liquid ketamine, see PSR ¶ 26), October 10 (sold vials of liquid ketamine after injecting Mr.

---

[1] As co-conspirator Chavez admitted in his plea agreement, Chavez had fraudulently obtained the prescription without the patient's knowledge or consent.

Perry in the back seat of a vehicle at an aquarium in Long Beach, see PSR ¶ 27), and October 12 (sold vials of ketamine, see PSR ¶ 28.)

Each time defendant left ketamine with Iwamasa, defendant was fully aware that Iwamasa --- who had no medical training --- would be administering the ketamine to Mr. Perry without medical supervision. (PSR ¶ 23.) In total, defendant distributed twenty vials of liquid ketamine, multiple ketamine lozenges, and syringes, to Mr. Perry and Iwamasa. In his plea agreement, defendant admitted his conduct fell below the proper standard of medical care and that transfers of ketamine Mr. Perry were not for a legitimate medical purpose.

### C. Aggravating Circumstances Related to Defendant's Sale of Ketamine to Mr. Perry

Several of defendant's illegal transfers of ketamine to Mr. Perry warrant consideration because they clearly exhibit the gravity of defendant's criminal conduct.

For example, defendant encouraged and guided Iwamasa to administer ketamine to Mr. Perry without any medical professional present. On October 4, 2023, Iwamasa texted defendant that he needed to get "more cans of dr prepper [ketamine vials] from you today, I can come to you to make it convenient." (Ex. 2 at 2.) Iwamasa told defendant that he found a good injection location on Mr. Perry, stating: "Found the sweet spot but trying different places led to running out." (Id.) In response, defendant told Iwamasa he would deliver more ketamine that evening, and that he "ha[d] ideas on how to get consistent results." (Id. at 3.)

As another example, on October 7, 2023, co-conspirator Iwamasa informed defendant in text messages that he "just ran out" of ketamine and immediately needed more. At approximately 11:29 p.m.,

6

defendant responded by text, stating he had two ketamine vials available and offered to meet co-conspirator Iwamasa in Santa Monica, noting: "Im at third street promenade now . . . If You would like to meet now." (PSR ¶ 26.)  Iwamasa then traveled to Santa Monica where defendant told Iwamasa he would be waiting outside a bar.  There, defendant sold Iwamasa ketamine on a public street corner at approximately 12:30 a.m. on October 8. (Id.; see Ex. 2 at 11.)

On October 10, 2023, defendant traveled to Long Beach, California where he met with Co-Conspirator Iwamasa and Mr. Perry in a parking garage at the Long Beach Aquarium.  (PSR ¶ 27.)  After administering ketamine to Mr. Perry in the backseat of a vehicle, defendant sold additional vials of ketamine to Co-Conspirator Iwamasa for approximately $6,500. (Id.)

During the scheme, defendant also understood how dangerous his conduct was for Mr. Perry's health.  On October 12, 2023, for example, defendant traveled to Mr. Perry's residence where he administered ketamine to Mr. Perry. After doing so, Mr. Perry had an adverse reaction which caused a blood pressure spike and Mr. Perry to freeze up.  (PSR ¶ 28.)  Notwithstanding Mr. Perry's reaction, defendant left additional vials of ketamine with co-conspirator Iwamasa, knowing that Iwamasa would continue to inject the ketamine into Mr. Perry.  (Id.)

After observing the adverse reaction, defendant also attempted to sell co-conspirator Iwamasa and Mr. Perry additional ketamine. Specifically, on October 27, 2023 --- the day before Mr. Perry's ketamine overdose death --- defendant sent the following text message to Iwamasa: "I know you mentioned taking a break. I have been stocking up on the meanwhile. I am not sure when you guys plan to

7

resume but in case its when im out of town this weekend I have left supplies with a nurse of mine." (Dkt. 76 at 10; PSR ¶ 29.)

### D. Defendant Altered and Falsified Records Related to the Federal Investigation

After Mr. Perry died of an overdose on October 28, 2023, law enforcement began investigating defendant. (Dkt. 76 at 11.) On January 25, 2024, DEA agents served a subpoena on defendant's medical practice, Malibu Canyon Urgent Care, seeking any and all medical records and notes. (Id.) Defendant responded to the subpoena around March 1, 2024, and in doing so, knowingly provided incomplete and inaccurate medical records for Mr. Perry. (Id.) Those included records about Mr. Perry that defendant modified after receiving the subpoena. (Id.) By creating inaccurate records for Mr. Perry, defendant admitted he intended to influence the government's ongoing investigation of defendant's wrongdoing. (Id.)

Among other things, defendant provided fraudulent handwritten medical notes purporting to document his "treatment" of Mr. Perry. (See Ex. 3.) As one example, defendant's notes for September 30, 2023 claimed that during defendant's visit to see Mr. Perry, defendant "Informed pt. that he should be monitored by physician when undergoing treatment as a safety measure. Empty vials of used solution may have been placed in waste bin." (Id. at 2.) This was false, as defendant well knew, because he delivered ketamine to Iwamasa knowing that Iwamasa would be administering the drug to Mr. Perry. Defendant's text messages to Mr. Perry also make that clear: defendant stated he would "leave supplies," meaning ketamine, with Mr. Perry for self-administration. (Dkt. 76 at 8.) As another example, defendant's handwritten notes for October 7, 2023, claims

8

that Mr. Perry "scheduled to meet for a treatment session but was not present." (See Ex. 3 at 7.)  As discussed above, however, Mr. Perry never arranged for "treatment" on October 7; defendant instead met Iwamasa on a street corner in Santa Monica around 12:30 a.m. to deliver vials of ketamine for Mr. Perry's unsupervised injection.

In response to the subpoena, defendant also provided a fraudulent patient invoice for Mr. Perry.  (See Ex. 4 (Under Seal).)  This invoice purported to justify why defendant was paid $57,000 for services to Mr. Perry, instead of the truth, which is that defendant was selling vials of ketamine to Iwamasa and Mr. Perry.  (See id.)  Among other clear indicia of fraud, the invoice represented that Mr. Perry's medical treatment began in January 2024 --- months after Mr. Perry died of a ketamine overdose.  (Id.)

**III. SENTENCING GUIDELINES CALCULATION**

As set forth in the government's objections to the PSR (the "Government's Objections"), the government agrees with the PSR's ultimate Guidelines calculation: defendant's total offense level is 13 (after a three-level reduction for acceptance of responsibility) and defendant's criminal history places him in Criminal History Category I.  (See Dkt. 91.)  For the reasons stated in the Government's Objections, this Court should rule that two additional special offense characteristics apply to the Group 1 counts, namely, a two-level vulnerable victim enhancement under U.S.S.G. § 3A1.1(b)(1) and a two-level aggravating role enhancement under

U.S.S.G. § 3B1.1.[2]  Thus, the government's calculation for Group 1 offenses is as follows:

| Group 1: Distribution of Ketamine | | |
|---|---|---|
| Base Offense Level (189 Units of Ketamine) | 6 | U.S.S.G. § 2D1.1(a)(6), 2D1.1(c)(17) |
| Vulnerable Victim | +2 | U.S.S.G. § 3A1.1(b)(1) |
| Aggravating Role | +2 | U.S.S.G. § 3B1.1 |
| Abuse of Position of Trust | +2 | U.S.S.G. § 3B1.3 |
| Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 |
| Group 1 Offense Level | 14 | |

As the defendant stipulated in his plea agreement, the PSR correctly determined that the factual basis establishes that defendant also committed the offense of Altering and Falsifying Records Related to a Federal Investigation, in violation of 18 U.S.C. § 1519 (referred to as "Count 1A" in the PSR).  (See PSR ¶¶ 43-44, 58-64.) The PSR correctly determined that Count 1A does not group with the Group 1 Counts, and that Count 1A has an adjusted offense level of 14.  (PSR ¶ 64.)

Based on the applicable two-level multiple count adjustment, see PSR ¶¶ 65-67, defendant's total offense level is 13 after accounting for acceptance of responsibility, see PSR ¶¶ 74.  Based on a total offense level of 13 and a Criminal History Category of I, the applicable guidelines range is 12-18 months' imprisonment.  (PSR ¶ 132.)  On October 22, 2025, the United States Probation and Pretrial Services filed a sentencing recommendation letter that recommends a

---

[2] As discussed in the Government's Objections, the vulnerable victim and aggravating role enhancements do not impact the overall guideline calculations. As a result, an upward variance is necessary to properly account for defendant's criminal conduct, as discussed further below.

10

sentence of 12 months' imprisoner, a fine of $5,600, and a two-year term of supervised release. (Recommendation Letter at 1-2.)

For the reasons discussed below, the government respectfully submits that a 12-month sentence fails to account for the significant aggravating factors present in this case, and that nothing less than 36 months' imprisonment would be fair, just, and appropriate under the circumstances.

### I. A 36-MONTH SENTENCE IS JUST AND APPROPRIATE GIVEN THE AGGRAVATING CIRCUMSTANCES IN THIS CASE

For the reasons set forth below, the government recommends that the Court sentence defendant to: (i) 36 months' imprisonment; (ii) followed by two years' supervised release; (iii) a mandatory special assessment of $400; and (iv) a fine of no less than $5,600. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

#### A. Defendant Violated His Oath to "Do No Harm" By Choosing Profits Over Patients

The nature and circumstances of defendant's crime warrant a significant term of imprisonment. Defendant was a medical doctor who exploited a vulnerable patient to pursue profit. Motivated by greed, defendant made tens of thousands of dollars selling ketamine to a patient who defendant knew suffered from drug addiction.[3] Indeed, on the day that defendant learned Matthew Perry was seeking ketamine, defendant made his intent clear to co-conspirator Chavez: "I wonder how much this moron will pay ... let's find out."

---

[3] Defendant cannot credibly dispute he was aware of Mr. Perry's history of substance abuse. Mr. Perry wrote a memoir discussing his long-term struggles with addiction and sobriety, and defendant witnessed clear signs of Mr. Perry's relapse during their meetings in September and October 2023.

11

But choosing profits over patients was not all defendant did. Defendant's criminal conduct caused Mr. Perry significant harm. In early October 2023, defendant sold vial after vial of ketamine to Mr. Perry knowing that co-conspirator Iwamasa --- someone with no medical training --- was administering ketamine to Mr. Perry. Defendant nonetheless provided syringes and training to Iwamasa so that Iwamasa could continue administering ketamine to Mr. Perry, even after defendant saw Mr. Perry experience a significant adverse ketamine reaction. After seeing Mr. Perry's health decline with his own eyes, defendant still offered to sell more ketamine to Mr. Perry. Specifically, approximately two weeks after witnessing Mr. Perry's adverse reaction, defendant told co-conspirator Iwamasa he had been "stocking up" ketamine and could resume selling if Perry wanted to purchase more. In fact, defendant had been calculating all along how he could monetize Perry's addiction, urging co-conspirator Chavez to find a steady supply of ketamine because defendant thought "it would be best served not having [Perry] look elsewhere" so the co-conspirators could "[b]e his go to." United States v. Chavez, 24-CR-492-SPG, Dkt. 3, at 14.

### B. But For Defendant's Greed, Defendant May Have Been the One To Cause Matthew Perry's Death

Defendant's Guidelines range also does not account for the fact that, but for defendant's greed, he very well might have sold Mr. Perry the ketamine that caused his death.

In fact, defendant tried to sell Iwamasa his ketamine just one day before Mr. Perry suffered his overdose. Defendant had been selling his ketamine to co-conspirator Iwamasa for a tremendous mark-up. As reflected in defendant's medical invoice, defendant charged

12

Perry approximately $57,000 for the ketamine, see Ex. 4, even though defendant could obtain the vials for $15 per vial, see Ex. 5. Rather than continue paying defendant's mark-up, in mid-October, Iwamasa switched suppliers to co-conspirator Sangha and Fleming, who charged much less than defendant. Despite being told that Mr. Perry was no longer interested in his ketamine, defendant reached back out to Iwamasa on October 27, 2023, trying to entice Iwamasa to resume purchasing from him. Defendant explained he had stocked up and was willing to leave ketamine for pick up from "a nurse of mine." (Dkt. 76 at 10.)

That defendant did not manage to sell more ketamine to Mr. Perry was likely due to the exorbitant price that defendant wanted to charge. But for his greed, defendant may have sold Mr. Perry the dose of ketamine that lead to his death. The Court should grant an upward variance to 36 months to account for defendant's callous, profit-seeking behavior.

### C. A Significant Term of Imprisonment Is Necessary to Provide Just Punishment and Deter Similar Egregious Breaches of Trust By Medical Professionals

A sentence of 36 months provides just and appropriate punishment to defendant for his wrongdoing, while sending a necessary message of deterrence to others who would seek to violate their oath and duty by choosing profits over patients.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: (i) 36 months' imprisonment; (ii) followed by two years' supervised release; (iii) a mandatory special assessment of $400; and (iv) a fine of no less than $5,600.

13